IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GRANT OSESUMEN ONOBUN | * | |
| Petitioner, | * | |
| v. | * | Civil Action No. GLR-24-2205 |
| ADESUA HARRIET OJIEKHUDU | * | |
| Respondent. | * | |

\*\*\*

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Petitioner Grant Osesumen Onobun's ("Father") Verified Petition for Return of Child to England & For Issuance of Show Cause Order (ECF No. 1). The Court has jurisdiction over this case under 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331. Respondent Adesua Harriet Ojiekhudu ("Mother") opposes the Petition. (ECF No. 19). The Court held a hearing and received testimony and exhibits on October 30, 2024 and October 31, 2024. (ECF Nos. 40, 41). For the reasons set forth below, the Court will grant the Petition and mandate the minor child ("ZEO" or "the child") be returned to England forthwith no later than 30 days from the date of this Order.

**I.     FINDINGS OF FACT**

The Court, having considered the initial Petition and the parties' briefing, and having conducted a hearing on October 30, 2024 and October 31, 2024, during which the Court heard testimony and received exhibits presented by both the Father and the Mother, makes the following findings of fact:

1. The Mother and the Father met in Nigeria in 2010.

2. The Mother and the Father were married on October 2, 2020, in Nigeria. (Marriage Certificate at GOO_000150, ECF No. 42).[1]

3. The Father emigrated to England on October 4, 2020, on a UK tier 2 visa, which is a residence and work visa. (See Parties' Immigration Documents at GOO_000005, GOO_000713000716, ECF No. 42).

4. The Mother remained temporarily in Nigeria, and the parties lived separately for nine months until the Mother emigrated to England to live with the Father in England in June 2021 on a dependent residence and work visa. (See Ojiekhudu Residency Cards at 1–2, ECF No. 39-1).

5. The Father and Mother lived in the Father's apartment until the parties moved into their new home together in Bolton, England in August 2021.

6. After the parties moved to Bolton, the Mother was terminated from her employment. (See Employment Termination Emails at GOO_000112000113, ECF No. 42).

7. The Mother obtained a B-2 tourist visa to travel to America in February 2023 when she was pregnant with the parties' child. (See Ojiekhudu U.S. Visa at 2, ECF No. 39-2; 2023 Airline Tickets at GOO_000704000706, ECF No. 42). The Mother's brother submitted a letter as part of the application for her tourist visa which represented that the Mother intended to return to England. The letter made no

---

[1] Where applicable, the Court cites to the Bates numbering found in the lower-right corner of the documents submitted as evidence before the Court. Otherwise, citations to the record refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

2

mention of any intention to remain in America permanently. (See also Revised Flight Itinerary, ECF No. 39-10).

8. The Mother left England to visit America in March 2023. (See Ojiekhudu U.S. Visa at 2; 2023 Airline Tickets at GOO_000704000706).

9. The Mother gave birth to the child in the Commonwealth of Virginia in 2023. (Child's Birth Certificate, ECF No. 39-3).

10. While the Mother and child were temporarily in America, the Father secured the family a new home in Harrogate, England.

11. During the Mother's stay in America and while convalescing after child, the Mother received compensation from the British government pursuant to a maternity allowance afforded to residents of England. These benefits terminated after she resumed work in December 2023. The Mother worked nights. The Father would care for the child while the Mother worked.

12. Health visitors went to the family home in England after the Mother's return to check in on the child.

13. The Mother and the child returned home to England on or about September 15, 2023 to the parties' new home in Harrogate.

14. The parties and the child resided together in their family home in England until May 29, 2024. (See Photographs of Child and Parents at Family Home in England at GOO_000092, GOO_000162000166, ECF No. 42; Photographs of Family Home in England at GOO_000084-000086, GOO_000089; Energy Bills and Correspondence from England at GOO_000211000213, ECF No. 42).

15. The family was settled and acclimated in their Harrogate home in England.

16. The parties then proceeded to plan the child's first birthday and prepare for the Father's parents' visit from Nigeria.

17. The Mother advised the Father that she was taking the child for the child's first birthday photoshoot during the day of May 29, 2024.

18. As the afternoon progressed into the evening, the Father and his parents became concerned for the Mother and the child because there was no word from the Mother.

19. When there was no word from the Mother, the Father contacted the English police and called all the local hospitals fearing that the Mother and the child had been in a car accident and admitted to a hospital.

20. The Father was not able to locate the Mother and the child that night.

21. Very early the next morning, the Father received a WhatsApp audio voicemail from the Mother informing the Father that she had gone to America with the child, that her life was ruined in England because she was terminated from her job, and that she was struggling with her mental health.

22. On or about June 4, 2024, the Father promptly submitted his Hague Application to the English Central Authority requesting the return of the child to England. (Hague Application to Central Authority for England & Wales at GOO_000184000198, ECF No. 42).

23. The English Central Authority then transmitted the Father's Hague Application to the U.S. State Department.

24. The parties had lived together in England since 2021.

25. Both parties worked in England full time until the Mother's termination.

26. The Father had secured the Mother a trainee biomedical scientist position at the Harrogate District Hospital, which she was to start in August 2024.

27. The Mother applied for and received permission to rent property in England. (Home Office Right to Rent Approval at GOO_000004, ECF No. 42).

28. The Father does not hold any United States visa that permits him to visit the United States, work in the United States, or reside in the United States.

29. The child received medical care in England. (See Child's English Medical Records at GOO_0000970000105, ECF No. 42).

30. The child participates in recreational activities at the Harrogate Library with her peers. (See Photographs of Child with Playmates in England at GOO_000084-000086, GOO_000089, ECF No. 42).

31. The child has family in England.

32. The Mother is present in the United States on a B-2 non-immigrant visa and/or an F-1 non-immigrant visa. Neither visa authorizes the Mother to work or reside permanently in the United States.

33. Since May 29, 2024, the Father has had no contact with the child, other than a short video call from the Mother with the child on July 8, 2024.

## II.     CONCLUSIONS OF LAW

### A.     Standard of Review

The Court adopts its standards of review from the Convention on the Civil Aspects of International Child Abduction, done at the Hague, October 25, 1980 (the "Hague Convention" or the "Convention"), which was adopted to address and discourage the problem of international unilateral action by one parent. See Lozano v. Montoya Alvarez, 572 U.S. 1, 4 (2014). Through the adoption of the Hague Convention, the State Parties, including England and the United States, have sought "to protect children internationally from the harmful effects of their wrongful removal or retention . . . ." Hague Convention, preamble; see also Hague Convention, art. 1; International Child Abduction Remedies Act ("ICARA"), 22 U.S.C § 9001; Abbott v. Abbott, 560 U.S. 1, 8 (2010); Chafin v. Chafin, 568 U.S. 165, 169–70 (2013); Maxwell v. Maxwell, 588 F.3d 245, 250 (4th Cir. 2009); Bader v. Kramer, 444 F.3d. 346, 349 (4th Cir. 2006); Cantor v. Cohen, 442 F.3d 196, 198 (4th Cir. 2006); Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001).

### B.     Prima Facie Case

In order to establish a prima facie case of wrongful removal under the Hague Convention, the movant must establish by a preponderance of the evidence: (1) the habitual residence of the child at the time of the removal; (2) that the removal breached the movant's custody rights under the law of the State in which the child was a habitual resident; and (3) that the movant was exercising custody rights at the time of the removal. Hague Convention, art. 3; Miller, 240 F.3d at 398. When the movant establishes by a preponderance of the evidence that the non-movant's removal of the child was wrongful

6

within the meaning of the Convention, the court "shall order the return of the child forthwith." Id. The Court will address each element in turn.

### i. Habitual Residency

Turning to the first element, the Court finds the child's habitual residence at the time of removal was England. The Supreme Court has held that courts must consider the totality of the circumstances in determining the child's habitual residence. Monasky v. Taglieri, 589 U.S. 68, 71 (2020). "Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense." Id. at 78 (cleaned up).

Here, the totality of circumstances establishes that the child's habitual residence at the time of the removal—May 29, 2024—was England. The Court heard testimony and received evidence which confirms that the child had a doctor in England, went to church and the local library in England, and lived in a home in England with both of her parents that appears to the Court to be well kept. (See, e.g., Child's English Medical Records at GOO_0000970000105; Photographs of Child with Playmates in England at GOO_000084-000086, GOO_000089; Photographs of Child and Parents at Family Home in England at GOO_000092, GOO_000162000166; Photographs of Family Home in England at GOO_000084-000086, GOO_000089).

The Mother contests this element, arguing that England was not the child's habitual residence, and instead, that the child had no habitual residency at all, which is a disfavored position. (See Resp't's Proposed Findings of Fact and Conclusions of Law at 2, ECF No. 25). During the hearing, the Mother relied heavily on the family's future plans of leaving

England and eventually settling in the United States and the fact that the child was born in the United States, as evidence to demonstrate that England was not the child's habitual residence. Based on the findings of fact, the Court is not persuaded by this argument.

First, the habitual residency element does not turn on "formal legal concepts like domicile and nationality." Monasky, 589 U.S. at 78–79. Instead, "[t]he Conference deliberately chose 'habitual residence' for its factual character, making it the foundation for the Convention's return remedy." Id. That is why even though a child's nationality may weigh more heavily when determining domicile, the habitual residency analysis requires a more holistic approach. See id. Second, the habitual residency analysis is not a forward-looking analysis. Miller, 240 F.3d at 400. The Fourth Circuit has explained that "[o]n its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward." Id. The Court's inquiry is therefore cabined by time, and, as a result, whether the parents agreed to eventually raise their child in the United States does not concern the child's habitual residence at the time of removal.

Even if the Court were to find as credible that both parents here agreed to eventually raise their daughter in the United States and that some steps were taken to execute that plan, those actions would still just be one factor amongst many this Court considers. Indeed, the very question the Supreme Court confronted in Monasky concerned "whether an actual agreement between the parents on where to raise their child [is] categorically necessary to establish an infant's habitual residence." 589 U.S. at 76. The Court answered no. Id. That said, the Court cautioned that "[b]ecause children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and

8

circumstances of caregiving parents are relevant considerations." Id. at 78. The intentions and circumstances of the parents here indicate that at the time of removal, England was the child's habitual residence.

First, on cross-examination, the Mother's brother, Abib Ojiekhudu, testified that in sponsoring his sister to visit the United States on a tourist visa in 2023, he swore to the United States government that the Mother only intended on temporarily visiting the United States, had a job in England, and otherwise had no intent to reside in the United States. Second, in describing the days leading up to her taking their child to Baltimore, the Mother testified that in a rush, she grabbed a folder that contained their child's most important documents, including her passport and medical records. When asked by the Court to clarify where this file of the child's most important documents was located, the Mother confirmed that it was kept in the family's home in England. Third, both parents worked in England, the Mother was receiving financial maternity benefits from the British government, and health workers visited the family's home to care for the child. Fourth, neither party owned property in America nor was authorized to work in America at the time of removal.

These admissions in open court, combined with the pictures of the family's home in England where the child lived for most of her young life up until the day of her removal, pictures of the child playing with children at church and at the library, the medical care the child was receiving in England, and the fact that as of May 2024 neither party had legal status to work in the United States and instead had legal status in England, (see Child's English Medical Records at GOO_0000970000105; Photographs of Child with Playmates in England at GOO_000084-000086, GOO_000089; Photographs of Child and Parents at

Family Home in England at GOO_000092, GOO_000162000166; Photographs of Family Home in England at GOO_000084-000086, GOO_000089), all together paint a picture of a child who was habitually residing in England as of May 2024.

To be sure, the evidence in the record tends to suggest that the parents conspired for the Mother to birth to their child in the United States. For instance, the Mother paid thousands of dollars to give birth to their child in Virginia when she otherwise could have given birth for free in England, and it likely would have been difficult for the Mother to fly back to England while eight months pregnant. Even so, considering the totality of the circumstances, the Court finds that Father has established that the child's habitual residency was England.[2]

### ii. Rights Under English Law

The Parties do not dispute that the Father has joint parental responsibility of the child under English law, which was supported by the Affidavit of Gemma Kelsey, Solicitor in England. (Gemma Kelsey Aff. ¶ 13, ECF No. 15).[3]

### iii. Exercising Rights at Time of Removal

The child lived with both the Mother and the Father at their family home in England up until the removal, (see Photographs of Child and Parents at Family Home in England at

---

[2] Additionally, evidence of the child's limited medical care in the United States (see Minor Child's Medical Records in the United States at 1–16, ECF No. 39-6), along with the Father not recognizing the names of the children or their parents that appear in photos with the child, still does not lead this Court to conclude that England was not the child's habitual residence.

[3] Indeed, the Father exercised parental custody of the child when he would care for the child while the Mother worked, and the parents clearly interacted together as a family unit.

...

GOO_000092, GOO_000162000166; Photographs of Family Home in England at GOO_000084-000086, GOO_000089; Energy Bills and Correspondence from England at GOO_000211000213), and when the Mother worked at night, the Father would care for the child. The Father contacted the police on the same day of the removal and filed a Petition under the Hague within five days. (See Hague Application to Central Authority for England & Wales at GOO_000184000198). These facts weigh in favor of finding that the Father was exercising his parental rights at the time of removal. See Rodriguez Palomo v. Howard, 426 F.Supp.3d 160, 177 (M.D.N.C. 2019), aff'd sub nom. 812 F.App'x 155 (4th Cir. 2020) (affirming district court's conclusion that petitioner was exercising custody rights at the time of removal because both parties lived together, petitioner was main caregiver of the child, and "[t]here has been no evidence presented demonstrating [p]etitioner clearly and unequivocally abandoned the child."); see also supra Note 2.

    The Court finds that the Father has met his prima facie case that the child's removal was wrongful by a preponderance of the evidence, and the Court now turns to Mother's argument that an exception to the Hague Convention applies.

C. **<u>Hague Convention Exceptions</u>**[4]

The Mother maintains as a defense to the Convention that the Father consented to the removal. (Answer at 9, ECF No. 19). If the Father "had consented to or subsequently acquiesced in the removal," the child does not have to be returned. <u>Miller</u>, 240 F.3d 392 at 399 (quoting Hague Convention, art. 13a). Consent or acquiescence must be shown by a preponderance of the evidence. <u>Padilla v. Troxell</u>, 850 F.3d 168, 175 (4th Cir. 2017). The Fourth Circuit has held that "[t]o establish consent, we focus on the parties' conduct prior to the removal or retention," though "a petitioner's conduct after removal can further inform whether []he consented at the time of removal." <u>Id.</u> (internal citations and emphasis omitted).

Here, the Mother principally relies on a telephone conversation between the parties on May 16, 2024, in which the Father told her: "Fine. You can have [the child]. You can have [the child]. You can take [the child] to America. You can do what you want to do." (May 16, 2024 Phone Call Transcript at 9:3–4, ECF No. 39-8). In the Mother's view, this establishes that the Father consented to her removal of the child. The Court disagrees for reasons described below.

---

[4] The Mother abandoned her grave risk defense two days before the evidentiary hearing. (ECF No. 35). In any event, the Court does not take lightly any allegations of abuse. The Mother testified that the days leading up to her decision to remove the child were the worst in her life. She testified that she experienced suicidal ideations and was medicated for depression, and she alleged that the Father physically abused her. This Court, however, is bound by its limited role to determine whether the Mother removing the child and flying to America was done with Father's consent. Apart from this narrow inquiry, it is up to the courts in England to determine the best custodial and familial arrangement for the child.

First, even accepting as true that the Father told the Mother that she could take the child to America, the Father never said that she could permanently move to the United States with their child. Second, taken in context, the Court finds as credible the Father's testimony that he said to take the child in an isolated moment of frustration. Earlier on that same call, the Father expressed disappointment with the Mother's decision not to come home stating: "You said you are not coming home. You categorically told me you are not coming home. And if you feel like you can tell me you're not coming home, I'm not going to force you to come home . . . ." (Id. at 7:7–10). The Court finds that the Father was simply telling the Mother that he cannot force her to come home. That is far different from consenting to the child's removal.

Additionally, the Father's actions immediately after the removal also weigh against finding consent. The day of the removal, he called the photo studio where he thought the Mother and the child were, called the Mother, called the Mother's family, sought help from his neighbors, and ultimately called the police. Five days later, he filed a Petition under the Hague to seek the return of his daughter. (Hague Application to Central Authority for England & Wales at GOO_000184000198); see Padilla, 850 F.3d at 175 ("[A] petitioner's conduct after removal can further inform whether []he consented at the time of removal."). Further, on cross-examination, the Mother all but conceded that she left on May 29, 2024 secretly, in a spur-of-the-moment, panicked decision. Such circumstances further confirm that the Father did not consent. See Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996) ("[The Father's] testimony is strongly supported by the circumstances of the removal of [the child]—most notably the fact that [the Mother] did not inform [the Father] that she

13

was departing . . . .The deliberately secretive nature of her actions is extremely strong evidence that [the Father] would not have consented to the removal of [the child]."). All together, these actions demonstrate that the Father fought against the removal at every turn, not that he consented or acquiesced to it. In sum, the Court finds that the Mother has failed to show by a preponderance of the evidence that the Father consented to the removal. Accordingly, this exception to the Hague Convention does not apply.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant the Verified Petition for the Return of the Minor Child to England (ECF No. 1). A separate Order follows.

Entered this 5th day of November, 2024.

                                          /s/
                           George L. Russell, III
                           Chief United States District Judge